# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALCOA, INC.,
                    *Petitioner,*

PACIFIC NORTHWEST GENERATING
COOPERATIVE AND MEMBERS; PUBLIC
POWER COUNCIL; AVISTA
CORPORATION; IDAHO POWER
COMPANY; PACIFICORP; PORTLAND
GENERAL ELECTRIC COMPANY;
PUBLIC UTILITY COMMISSION OF
OREGON; PUGET SOUND ENERGY,
INC.,
                    *Intervenors,*

            v.

BONNEVILLE POWER
ADMINISTRATION; U.S.
DEPARTMENT OF ENERGY,
                    *Respondents.*

No. 10-70211

BPA No.
10PB-12175

CANBY UTILITY BOARD,
                    *Petitioner,*

ALCOA, INC.,
                    *Intervenor,*

            v.

BONNEVILLE POWER
ADMINISTRATION,
                    *Respondent.*

No. 10-70707

12381

PUBLIC POWER COUNCIL,

*Petitioner,*

ALCOA, INC.,

*Intervenor,*

v.

BONNEVILLE POWER
ADMINISTRATION; U.S.
DEPARTMENT OF ENERGY,

*Respondents.*

No. 10-70743

INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES,

*Petitioner,*

ALCOA, INC.,

*Intervenor,*

v.

BONNEVILLE POWER
ADMINISTRATION,

*Respondent.*

No. 10-70782

NORTHWEST REQUIREMENTS
UTILITIES,
                        *Petitioner,*

ALCOA, INC.,
                        *Intervenor,*

                    v.

U.S. DEPARTMENT OF ENERGY;
BONNEVILLE POWER
ADMINISTRATION,
                        *Respondents.*

No. 10-70813

PACIFIC NORTHWEST GENERATING
COOPERATIVE; BLACHLY-LANE
COUNTY COOPERATIVE ELECTRIC
ASSOCIATION; CENTRAL ELECTRIC
COOPERATIVE, INC.; CLEARWATER
POWER COMPANY; CONSUMERS
POWER, INC.; COOS-CURRY ELECTRIC
COOPERATIVE, INC.; DOUGLAS
ELECTRIC COOPERATIVE; FALL RIVER
RURAL ELECTRIC COOPERATIVE, INC.;
LANE ELECTRIC COOPERATIVE;
NORTHERN LIGHTS, INC.; OKANOGAN
COUNTY ELECTRIC COOPERATIVE,
INC.; RAFT RIVER RURAL ELECTRIC
COOPERATIVE, INC.; UMATILLA
ELECTRIC COOPERATIVE
ASSOCIATION; WEST OREGON
ELECTRIC COOPERATIVE, INC.,
                        *Petitioners,*

ALCOA, INC.,
                    *Petitioner-Intervenor,*

ALCOA, INC.,
                              *Intervenor,*

                    v.

U.S. DEPARTMENT OF ENERGY;
BONNEVILLE POWER
ADMINISTRATION,
                              *Respondents.*

No. 10-70843
OPINION

On Petition for Review of an Order of the
Bonneville Power Administration

Argued and Submitted
May 5, 2011—Portland, Oregon

Filed October 16, 2012

Before: A. Wallace Tashima, Carlos T. Bea, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Concurrence by Judge Tashima;
Partial Concurrence and Partial Dissent by Judge Bea

**COUNSEL**

Michael C. Dotten and Dustin T. Till, Marten Law Group, Portland, Oregon, for petitioner-intervenor Alcoa, Inc.

R. Erick Johnson, R. Erick Johnson, PC, Lake Oswego, Oregon, for petitioners Pacific Northwest Generating Cooperative et al.

Melinda J. Davidson and Irion Sanger, Davidson Van Cleve, PC, Portland, Oregon, for petitioner Industrial Customers of Northwest Utilities.

Mark R. Thompson, Public Power Council, Portland, Oregon, for petitioner Public Power Council.

Betsy Bridge, Law Office of Betsy Bridge, LLC, Portland, Oregon, for petitioner Northwest Requirements Utilities.

Daniel Seligman, Seattle, Washington; David Doughman, Beery, Elsner & Hammond, LLC, Portland, Oregon, for petitioner Canby Utility Board.

David J. Adler and J. Courtney Olive, Special Assistant U.S. Attorneys, Portland, Oregon, Randy A. Roach, Timothy A. Johnson, Herbert V. Adams and John D. Wright, Bonneville Power Administration, Portland, Oregon, for respondent Bonneville Power Administration.

Jay T. Waldron, Schwabe, Williamson & Wyatt, Portland, Oregon, on behalf of respondent-intervenors Avista Corporation, Idaho Power Company, Pacificorp, Portland General Electric Company, and Puget Sound Energy, Inc.

---

**OPINION**

IKUTA, Circuit Judge:

These consolidated petitions for review challenge a contract between the Bonneville Power Administration (BPA) and one of its long-time customers, Alcoa Inc. BPA's preference customers, as well as other entities and organizations in the Pacific Northwest, filed this petition for review, requesting that we hold that the contract is unlawful because it is inconsistent with the agency's statutory mandate to act in accordance with sound business principles. They claim that instead of entering into a contract to sell power to Alcoa at the statutorily required Industrial Firm power (IP) rate (a cost-based rate prescribed by 16 U.S.C. § 839e(c)(1) for sales of power to customers such as Alcoa), BPA should sell to other buyers at the market rate. BPA's decision not to do so, petitioners allege, forgoes revenue that could otherwise be used to lower the rates charged to its preference customers. They further argue that BPA relied on flawed data in determining it would make a modest profit by selling surplus power to Alcoa. Alcoa also petitions for review, asking the court to hold that the Equivalent Benefits standard[1] is contrary to

---

[1]According to the Power Sales Agreement between BPA and Alcoa (referred to here as the "Alcoa Contract"), the Equivalent Benefits standard requires that BPA "derive[ ] benefits equivalent to the cost of providing Alcoa with electric power service." BPA determined this Equivalent Benefits standard was met for the initial period of the Agreement and provided that the Alcoa Contract will enter into a Second Period in the event that "a Court holds that the Equivalent Benefits standard does not apply to this Agreement." *See infra* p. 12397.

BPA's governing statutes, Alcoa makes this request because such a judicial determination is a condition precedent for the commencement of a five-year period (the "Second Period" of the Alcoa Contract) during which time BPA would continue to sell power to Alcoa at the contracted rate. In May 2012, the Alcoa Contract was amended to remove all references to the Second Period. We dismiss the petitioners' and Alcoa's challenge in part as moot, and otherwise reject their claims.[2]

I

BPA's Statutory Duties

A.   Categories of Customers BPA Serves

BPA is a federal agency within the Department of Energy which "has marketing authority over nearly all the electric power generated by federal facilities in the Pacific Northwest." *Ass'n of Pub. Agency Customers, Inc. v. BPA* (*APAC*), 126 F.3d 1158, 1163 (9th Cir. 1997). We have previously detailed the "complex statutory landscape" under which BPA operates at length. *See Pac. Nw. Generating Coop. v. Dep't of Energy* (*PNGC I*), 580 F.3d 792, 799 (9th Cir. 2009). For present purposes, we focus on BPA's statutory obligations to three different types of customers.

First, "in disposing of electric energy generated" at BPA projects, BPA is required to "give preference and priority" to "public bodies[3] and cooperatives" that purchase power from

_____

[2]We use the term "petitioners" to refer collectively to the Pacific Northwest Generating Cooperative (PNGC), Industrial Customers of Northwest Utilities (ICNU), Public Power Council (PPC), Northwest Requirements Utilities, and Canby Utility Board. We refer to Alcoa Inc. separately as "Alcoa" because petitioners' and Alcoa's claims are distinct from, and often opposed to, each other's.

[3]"Public bodies" include "[s]tates, public power districts, counties, and municipalities, including agencies of subdivisions of any thereof." 16 U.S.C. § 832b.

BPA for resale to their consumers. 16 U.S.C. § 832c(a). These entities are "preference" customers, and BPA is required to give priority to their applications for power when competing applications from nonpreference customers are received. *See id.* § 832c(b).

Second, BPA is authorized to sell power to private, investor-owned utilities (IOUs), which, like the preference customers, buy power for resale to ultimate consumers. *See id.* § 832d(a); *APAC*, 126 F.3d at 1164.

Third, BPA may sell to a limited group of "direct service industrial customers" (DSIs), which are large industrial companies with a high demand for electricity. 16 U.S.C. § 839c(d). Unlike BPA's other customers, DSIs purchase power directly from BPA for their own consumption, not for resale. *Id.* § 839a(8); *APAC*, 126 F.3d at 1164. Alcoa, the power purchaser in the contract at issue here, is one of BPA's DSI customers, and runs an aluminum smelting operation at its Intalco plant in Ferndale, Washington.

B.   BPA's Rate Structure and "Sound Business Principles"

BPA's statutory framework also sets out the specific criteria by which BPA determines the rates it may charge for power to these different customers. Regardless of the type of customer, BPA must charge a rate that, at a minimum, recoups BPA's own costs of generating or acquiring the electricity. *See* 16 U.S.C. § 839e(a)(1).

BPA charges preference customers a cost-based rate, referred to as the priority firm or "PF rate," that allows BPA to recover the costs of generating or obtaining the power required to meet the preference customers' needs. *Id.* §§ 839c(a), 839e(b);[4] *see also PNGC I*, 580 F.3d at 802. IOUs

_____

[4] 16 U.S.C. § 839e(b)(1) provides that the PF rate "shall recover the costs of that portion of the Federal base system resources needed to supply

can elect to sell power to BPA "at the average system cost of the utility's resources," *id.* § 839c(c)(1), and then buy power back from BPA at the PF rate. *Id.* §§ 839c(c); 839e(b). This subsidy "enables the [IOU] to sell power to its residential customers at the priority rate given to residential consumers receiving BPA federal power." *Central Elec. Coop., Inc. v. BPA*, 835 F.2d 199, 201 (9th Cir. 1987) (quoting *Pacificorp v. Fed. Energy Regulatory Comm'n*, 795 F.2d 816, 818 (9th Cir. 1986)).

DSI customers also pay a cost-based rate (the "IP rate"), which is prescribed by § 839e(c).[5] *PNGC I*, 580 F.3d at 812

---

[preference customers'] loads until such sales exceed the Federal base system resources. Thereafter, such rate or rates shall recover the cost of additional electric power as needed to supply such loads . . . ." Federal base system resources are defined as: "(A) the Federal Columbia River Power System hydroelectric projects; (B) resources acquired by the [BPA] under long-term contracts in force on December 5, 1980; and (C) resources acquired by the [BPA] in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph." 16 U.S.C. § 839a(10).

[5]16 U.S.C. § 839e(c)(1) provides, in pertinent part:

(c) Rates applicable to direct service industrial customers

(1) The rate or rates applicable to direct service industrial customers shall be established . . . (B) for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.

(2) The determination under paragraph (1)(B) of this subsection shall be based upon the Administrator's applicable wholesale rates to such public body and cooperative customers and the typical margins included by such public body and cooperative customers in their retail industrial rates but shall take into account—

(A) the comparative size and character of the loads served,

(B) the relative costs of electric capacity, energy, transmission, and related delivery facilities provided and other service provisions, and

("[W]hen entering into contracts for the sale of firm power to a DSI, [BPA] must initially offer the IP rate.") The IP rate must be "equitable in relation to the retail rates charged" by BPA's preference customers to their own industrial consumers in the region, 16 U.S.C. § 839e(c)(1)(B), and is always higher than the PF rate, *Golden Nw. Alum., Inc. v. BPA*, 501 F.3d 1037, 1046-47 (9th Cir. 2007).

In addition to charging all customers at a rate that recoups BPA's costs of generating or acquiring electricity, 16 U.S.C. § 839e(a)(1), BPA is also responsible for setting rates in accordance with "sound business principles." Thus, § 838g prescribes general factors BPA must balance when setting rates for the sale and transmission of federal power:

> Such rate schedules . . . shall be fixed and established (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers *consistent with sound business principles*, (2) having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric power . . . and (3) at levels to produce such additional revenues as may be required, in the aggregate with all other revenues of the Administrator, to pay [all expenses associated with] bonds issued and outstanding pursuant to this chapter, and amounts required to establish and maintain reserve and other funds and accounts established in connection therewith.

---

(C) direct and indirect overhead costs.

all as related to the delivery of power to industrial customers, except that the Administrator's rates during such period shall in no event be less than the rates in effect for the contract year ending on June 30, 1985.

*Id.* § 838g (emphasis added). Section 839e similarly sets guidelines for fixing "rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power." *Id.* § 839e(a)(1). Specifically, those rates:

> shall . . . recover, *in accordance with sound business principles*, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System . . . and the other costs and expenses incurred by the [BPA] pursuant to this chapter and other provisions of law.

*Id.* § 839e(a)(1) (emphasis added). Finally, BPA is charged with "assur[ing] the timely implementation of [16 U.S.C. §§ 839-839h] in a *sound and businesslike manner.*" *Id.* § 839f(b) (emphasis added).

## C.   Prior Alcoa Contracts

Before entering into the Alcoa Contract, BPA and Alcoa entered into two prior power sales contracts. In response to a challenge to these prior contracts by many of the same petitioners involved in this case, we struck down key provisions of these contracts. *See Pac. Nw. Generating Coop. v. BPA* (*PNGC II*), 596 F.3d 1065 (9th Cir. 2010). Because the details of those contracts are described at length in those opinions, we describe only the relevant points here. In each agreement, BPA entered a power sale contract with Alcoa, but the terms of the contract did not require BPA to provide power to Alcoa. *PNGC II*, 596 F.3d at 1069-70. Instead, the contract provided that BPA would make a cash payment to Alcoa that was approximately equal to the difference between the regional market price of electricity and either the PF rate (under the contract at issue in *PNGC I*) or the IP rate (under the contract in *PNGC II*), both of which are significantly below the regional market price for electricity. *Id.* at 1070;

*PNGC I*, 580 F.3d at 800. The payments at issue were not trivial: The first contract provided that BPA would pay Alcoa up to $295 million over 5 years, *PNGC I*, 580 F.3d at 798, and the second provided that BPA would pay Alcoa nearly $32 million over the course of 9 months, *PNGC II*, 596 F.3d at 1070. In *PNGC I*, we held that BPA's decision to offer power to a DSI at the PF rate (rather than the IP rate), and then monetize those rates, was invalid because inconsistent with BPA's statutory authority. 580 F.3d at 823. After BPA modified its contract with Alcoa to offer power at the IP rate, we held that BPA's decision to "incur a $32 million expense that will increase the rates of its preference customers, provides no direct benefit to the agency, and subsidizes the operations of its competitors" violated its statutory obligation to set rates for power sales in a manner that is "consistent with sound business principles." *PNGC II*, 596 F.3d at 1085-86. We held that this "sound business principles" standard was applicable, even though BPA's contract required it to sell Alcoa power at the IP rate. *Id.* at 1072-73. As we explained, BPA had no obligation to sell Alcoa power at all, but if it entered into a contract with Alcoa, it would have to offer the IP rate. *Id.* at 1073. We noted that if the market rate were higher than the IP rate, BPA should consider whether sound business principles weighed against entering into such a contract. *Id.*

Although striking down BPA's prior contracts with Alcoa on the ground that they were inconsistent with BPA's statutory requirements, we did not expressly establish any criteria that BPA would have to meet to ensure its contracts were consistent with sound business principles. BPA, however, interpreted *PNGC II* as holding that in order for BPA "to offer a sale of power to a DSI, BPA must conclude based on evidence in the record that the proposed transaction will result in benefits that equal or exceed the costs to BPA of the transaction." BPA has dubbed its interpretation the "Equivalent Benefits standard" or the "Equivalent Benefits Test."

### D.   The Current Alcoa Contract

BPA restructured its agreement with Alcoa in light of this Equivalent Benefits standard. On December 21, 2009, it entered into the Alcoa Contract, which defined four different time periods: (1) an "Initial Period," (2) an "Extended Initial Period," (3) a "Transition Period"; and (4) a "Second Period."

The Alcoa Contract defined the Initial Period as "the period December 22, 2009, through the earlier of (i) May 26, 2011; or (ii) the start of the Second Period."[6] During the Initial Period, BPA agreed to sell, and Alcoa to buy, up to 320 average megawatts (aMW) of electricity. As required by statute, all such power sales "will be made to Alcoa at the then applicable Industrial Firm power (IP) rate." *See also* Administrator's Record of Decision ("The sale [in the Alcoa Contract commencing December 22, 2009] is priced at the Industrial Firm power ('IP') rate, . . . which is the applicable rate for sales of non-surplus firm power to BPA's direct service industrial ('DSI') customers.").

Although BPA complied with the statutory requirement to sell power to Alcoa at the IP rate, because BPA could have declined to sell power to Alcoa at all, BPA was also required to consider whether its power sale to Alcoa was consistent with "sound business principles." *PNGC II*, 596 F.3d at 1073. BPA did so. As explained in its Record of Decision, BPA determined that its sale of power during the Initial Period was consistent with the Equivalent Benefits standard that it had derived from *PNGC I* and *II*. Using market forecasts, projected water-flow patterns, and other data, BPA concluded it could earn a profit on a sale of electricity to Alcoa from December 22, 2009 through May 26, 2011. It calculated this total net benefit to be approximately $10,000.

---

[6]Because the Second Period had not begun by May 26, 2011, the Initial Period terminated as scheduled on that date.

The Alcoa Contract also provided that at the end of the Initial Period, Alcoa could request a three- to twelve-month extension (the "Extended Initial Period"). BPA was required to agree to this extension if it determined that it would obtain Equivalent Benefits, as defined, from its sales to Alcoa during that period. As noted, the Alcoa Contract defined "Equivalent Benefits" as benefits accruing to BPA as a result of providing power to Alcoa that equal or exceed BPA's costs of providing the power. At oral argument, the parties informed us that Alcoa and BPA had executed an agreement to enter into the Extended Initial Period for one year; that period expired on May 26, 2012. According to BPA, this separate action could have formed the basis for a separate petition for review and, therefore, the validity of the Extended Initial Period was not before us.

After the Initial Period and any Extended Initial Period, the Alcoa Contract provided for a Transition Period and a Second Period. The one-year Transition Period would occur only if "the Ninth Circuit issues an opinion or other ruling holding, or that BPA determines can reasonably be interpreted to mean, that the Equivalent Benefits standard does *not* apply to sales under [the Alcoa Contract]." (emphasis added).

Upon the occurrence of this contingency, BPA would have up to one year to determine whether: (i) service to Alcoa during the Second Period would be "consistent with any alternative standard established by any such opinions" and other applicable rulings; and (ii) the cost to serve Alcoa will not exceed specified cost caps. If these criteria were met, the Second Period would commence and last for five years. During the Second Period, BPA would sell, and Alcoa would buy, 320 aMW of electric power at the IP rate during each year the contract is in effect.

After the Extended Initial Period passed, the parties entered into discussions regarding extending the contract beyond May 26, 2012. To accommodate these negotiations, the parties

entered into three successive short term amendments, which extended the Initial Period from: (1) May 27, 2012 to June 30, 2012; (2) July 1, 2012 to July 31, 2012; and (3) August 1, 2012 to August 31, 2012. In addition, the May-June 2012 amendment provided that "all references in the Agreement to 'Second Period' are hereby removed and all contract clauses implementing the Second Period shall have no effect."

## E.    The Record of Decision for the Alcoa Contract

BPA released a draft of the Alcoa Contract for public comment in October 2009, and issued the final version of the contract and Record of Decision (ROD) on December 21, 2009. In the ROD, BPA explained its determination that it did not have to prepare an Environmental Impact Statement (EIS) for the Alcoa Contract because it fell within a categorical exclusion from review under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347. *See* 10 C.F.R. pt. 1021, subpart D, App. B4.1.[7] The ROD stated that BPA would be able to "supply power to Alcoa's Intalco Plant from existing generation sources, [which] would be expected to continue to operate within their normal operating limits." The power "would be supplied to the Intalco Plant over existing transmission lines," meaning that "no physical changes to this system would occur." BPA therefore concluded that the above categorical exclusion applied and exempted the Alcoa Contract from NEPA's requirements.

---

[7]This regulation exempts the following actions from the EIS requirement:

> Establishment and implementation of contracts, marketing plans, policies, allocation plans, or acquisition of excess electric power that does not involve: (1) the integration of a new generation resource, (2) physical changes in the transmission system beyond the previously developed facility area, unless the changes are themselves categorically excluded, or (3) changes in the normal operating limits of generation resources.

10 C.F.R. pt. 1021, subpart D, App. B4.1.

### F.   Effect of Amendment to *PNGC II*

In March 2010, after the parties executed the Alcoa Contract, we added a clarifying amendment to *PNGC II* in response to BPA's petition for review. The amended opinion distinguished "BPA's voluntary decision to provide Alcoa with up to $32 million in cash payments" from "the decision to sell physical power to Alcoa" (at the IP rate) noting that the latter was different because "the sale of physical power to the DSIs is expressly authorized by statute, *see* § 839c(d)(1)(A)," and therefore "BPA's conclusion that such a sale is in its business interests is more likely to be reasonable." 596 F.3d at 1085. Further, we observed that "many of the justifications that BPA gave for its decision to execute the costly amended contract, though inapplicable to a 'monetized' sale, would apply to a physical power sale." *Id.* Finally, we noted that "a physical power sale implicates a number of issues that fall within BPA's particular expertise," such as "BPA's current and future generating capacity, its transmission capabilities, its relationship with suppliers, its current and projected commitments of physical power to other customers, its ability to acquire additional power if needed, and so forth." *Id.* Accordingly, we stated that "the agency's conclusion that a physical sale of power to Alcoa, even at loss, furthered its business interests might very well warrant our deference." *Id.*

In its briefs on appeal here, BPA argued that this amendment to *PNGC II*, which acknowledged that a physical sale of power at the IP rate, "even at a loss" (compared to selling the power at the market rate), might further BPA's business interest, could "reasonably be interpreted to mean that the Equivalent Benefits Test does not apply to sales under the Alcoa Contract," and therefore might meet the first contingency for the Second Period. But both at oral argument and in a subsequent letter brief, BPA clarified that no prior opinion of this court, including *PNGC II* as amended, had rejected the Equiv-

alent Benefits Test and that the first requirement for triggering the Second Period had not been met.[8]

After BPA issued the ROD and executed the Alcoa Contract, many of BPA's preference customers, as well as other entities and organizations in the Pacific Northwest, filed this petition for review, requesting that we hold that the contract is unlawful and invalid because it is inconsistent with the agency's statutory mandate to act in accordance with sound business principles. They claim that BPA should not have entered into a contract with Alcoa at the IP rate when BPA could have instead sold that same power at a higher market rate. Because BPA must set its rates to cover all its system costs, petitioners argue, if BPA had maximized profits by selling power in the market, it could have charged its preference customers a lower rate. According to petitioners, this failure to maximize profits violates BPA's duty to provide power "at the lowest possible rates to consumers consistent with sound business principles."

Alcoa also petitions for review, asking us to hold that BPA erred in adopting the Equivalent Benefits standard, because such a ruling is a condition precedent for commencement of a Second Period under the Alcoa Contract. Finally, PPC argues that BPA violated NEPA by failing to prepare an EIS. According to PPC, the Alcoa Contract did not fall within a categorical exclusion to NEPA, because the status quo is Alcoa's inevitable closure of its smelter, and the Alcoa Contract changes the status quo by allowing the smelter to keep operating. All these arguments are wrong.

---

[8]This clarification was crucial to BPA's arguments at the time, because under the original contract, the Second Period had to begin "no later than 12 months after" issuance of the Ninth Circuit decision that, in BPA's opinion, met the first contingency (i.e., a determination that the Equivalent Benefits standard does not apply to sales under the Alcoa Contract). If the amendment to *PNGC II* had triggered this 12 month period, the time period during which the Second Period had to begin would have lapsed on March 2, 2011.

## II

### The Initial Period of the Alcoa Contract

We consider each of petitioners' distinct legal and factual challenges in turn. We have jurisdiction over these consolidated petitions pursuant to 16 U.S.C. § 839f(e)(5) and must uphold "BPA's actions unless they are 'arbitrary, capricious, an abuse of discretion, or in excess of statutory authority.' " *PNGC I*, 580 F.3d at 806 (quoting *Aluminum Co. of Am. v. BPA*, 903 F.2d 585, 590 (9th Cir. 1990)). When reviewing whether BPA has acted "in accordance with law," we defer to BPA's reasonable interpretations of its governing statutes. *See, e.g.*, *Nw. Envtl. Def. Ctr. v. BPA*, 117 F.3d 1520, 1530 (9th Cir. 1997).

### A.  The Controversy Is Not Moot

Before considering the contract terms relating to the Initial Period, we must first determine whether the petitioners' challenges to this part of the contract are moot. *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1005 (9th Cir. 2010). The Initial Period of the Alcoa Contract concluded on May 26, 2011, and BPA has completed its performance under that part of the contract. Thus, we cannot return the parties to their original position because Alcoa cannot return the power it obtained from BPA. *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1978) (holding that "[w]here the activities sought to be enjoined have already occurred, and the appellate courts cannot undo what has already been done, the action is moot"); *see also Feldman v. Bomar*, 518 F.3d 637, 642-43 (9th Cir. 2008). Nor is there any legal basis to conclude that Alcoa is liable to BPA for the difference between the IP rate for power charged under the contract and a higher market rate. BPA charged Alcoa the statutorily mandated IP rate; it was not empowered to charge either more or less. *PNGC I*, 580 F.3d at 818. In short, to the extent that the petitioners' claim is that BPA should have sold

surplus power at market rates, and not contractually bound itself to sell power at the lower IP rate during the Initial Period, we cannot offer relief after the Initial Period has concluded.

**[1]** Nevertheless, we conclude that the petitioners' challenge "is not moot because it falls within a special category of disputes that are 'capable of repetition' while 'evading review.' " *Turner v. Rogers*, 131 S. Ct. 2507, 2514-15 (2011) (quoting *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911)). "A dispute falls into that category, and a case based on that dispute remains live, if '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.' " *Id.* at 2515 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam) (alterations in original)). The rationale behind this exception is straightforward: some activities or situations are inherently fleeting in nature, such that orderly and effective judicial review would be precluded if we hewed strictly to the requirement that only a presently live controversy presents a justiciable question. In such cases, if a particular plaintiff is likely to suffer the same or very similar harm at the hands of the same defendant, the alleged wrongdoer should not be permitted to escape responsibility simply because the transaction is completed before an appellate court has a chance to review the case.

We have previously relied on this exception to the mootness doctrine in a case examining a BPA contract. In *California Energy Resources Conservation & Development Commission v. BPA*, 754 F.2d 1470 (9th Cir. 1985), a state energy agency challenged a contract between BPA and certain electric utilities for the provision of hydroelectric power that had been fully performed within a four month period. BPA argued that the case was moot because the challenged contracts had been completed and terminated. *Id.* at 1473. We disagreed, observing that "short-term transactions such as

these before us can evade review in the sense that they can be completed in a shorter time than that required by the parties and this court to file, brief, argue, and decide a case." *Id.* We also reasoned that because the unpredictability of the hydro-electric power market could give rise to conditions where short-term sales were desirable, it was foreseeable that the parties could enter similar agreements in the future. *Id.*

The test for transactions that are "capable of repetition while evading review" is applicable to the petitioners' challenge to the Initial Period. Turning to the "evading review" prong of the test, we consider whether the 17 months of the Initial Period is so short a time that it renders effective review unlikely. "[W]e have recognized that 'evading review' means that the underlying action is almost certain to run its course before either this court or the Supreme Court can give the case full consideration." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 855 (9th Cir. 1999) (quoting *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 453-54 (9th Cir. 1994)). According to *Turner*, events that are completed within 18 months, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 774-75 (1978), or even within 2 years, *S. Pac. Terminal Co.*, 219 U.S. at 515, can be " 'too short to be fully litigated' through the state courts (and arrive [at the Supreme Court]) prior to its 'expiration.' " *Turner*, 131 S. Ct. at 2515. We have held that a federal regulation establishing a "total allowable catch" for pollock in the Gulf of Alaska, which was in effect for less than one year, would evade "effective judicial review," *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329-30 (9th Cir. 1992), and have held with respect to the Forest Service's issuance of a two-year special use permit that "the duration of the permit is too short to allow full litigation before the permit expires." *Alaska Ctr.*, 189 F.3d at 856. Nor, as discussed above, is BPA any stranger to this mootness exception. *See Pub. Util. Comm'r v. BPA*, 767 F.2d 622, 625 (9th Cir. 1985) (holding that a BPA ratemaking procedure of one year's duration did not supply sufficient time for adequate judicial review). And the exception may be applied even

where (as here) the parties do not seek expedited review or a stay pending appeal. *Alaska Ctr.*, 189 F.3d at 856. Although petitioners may bring a challenge to a BPA contract directly in this court, as a practical matter a transaction set for a term of 17 months, such as the Initial Period in this case, would be likely to expire before our review (let alone the Supreme Court's) could be completed.[9] Accordingly, we conclude that the transaction at issue here is likely to "evade review."

Turning to the second prong, the challenged conduct is capable of repetition where there is evidence that it has occurred in the past, or there is a "reasonable expectation" that the petitioner would again face the same alleged invasion of rights. *Id.*; *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 774 (1978); *Cal. Energy Res.*, 754 F.2d at 1473; *Trans Int'l Airlines*, 650 F.2d at 956 n.5. This case presents the required "reasonable expectation" of repetition. Indeed, BPA has already extended the Initial Period four times using identical terms, except that the extensions (of 12 months, 1 month, 1 month, and 1 month, respectively) were for briefer periods of time than the 17-month Initial Period.

**[2]** Furthermore, even though the petitioners can theoretically challenge the Extended Initial Period, that challenge would likely also be moot by the time we are ready to hear the case. Because BPA could continue to enter into agreements of such short duration, the agreements could effectively escape judicial review before their completion. Under these circumstances, we should apply the "capable of repetition yet evading review" exception, as directed by *Turner*.

Accordingly, we proceed to the merits of petitioners' and Alcoa's claims regarding the Initial Period.

---

[9]In 2010 and 2011, the most recent years for which data are available, the average time in this court from the filing of a notice of appeal through to final disposition of a case was 16.4 and 17.4 months, respectively. *Ninth Circuit: 2011 Annual Report* 59, *available at* http://www.ce9.uscourts .gov/publications/AnnualReport2011.pdf.

### B.  BPA's Failure to Maximize Its Profits

The petitioners argue that BPA violated its statutory responsibilities in agreeing to sell surplus power at the IP rate to Alcoa pursuant to the terms of the Initial Period. First, the petitioners argue that by selling the power to Alcoa at the statutorily mandated IP rate, and thus forgoing the profits that could be made by selling surplus power on the market, BPA violated its statutory responsibility to operate pursuant to sound business principles. Second, the petitioners challenge the analysis supporting BPA's conclusion that it will make a modest profit of $10,000 by selling power to Alcoa at the IP rate during the Initial Period. The petitioners claim that BPA erred in its method for determining the cost of the program and will likely fail to make a profit, contrary to the Equivalent Benefits standard. Third, the petitioners claim that BPA's waiver of potential claims against Alcoa violates BPA's statutory and constitutional authority. Finally, Alcoa argues that it is arbitrary and capricious for BPA to adhere to the Equivalent Benefits standard because neither *PNGC II* nor the governing statutes requires BPA to sell power to DSIs at the market rate.

In reviewing these arguments, we consider merely whether "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made"; we do not second-guess its policy judgments. *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)).

First, we consider petitioners' argument that BPA's statutory obligation to operate in accordance with "sound business principles" requires BPA to forego selling its power at the IP rate to Alcoa, and instead to maximize its profits, as a private corporation would strive to do. *See* 16 U.S.C. §§ 839e(a)(1), 839f(b), 838g. The failure to maximize profits that could otherwise be used to lower the rates charged to its preference

customers, petitioners argue, violates BPA's duty to provide power "at the lowest possible rates to consumers consistent with sound business principles." *See also PNGC I*, 580 F.3d at 821 (noting that because BPA's rates are based on its "total system costs," 16 U.S.C. § 839e(a)(2), a "side-effect" of selling power at the lower IP rates for the DSIs "will be an *increase* in the rates paid by a much larger set of customers- the businesses, industries, farms, and residences served by public utilities, electrical cooperatives, and investor-owned utilities with BPA power"). According to ICNU, BPA did not operate in accordance with sound business principles because the sale of power to Alcoa at the IP rate during the Initial Period will net the agency a profit of only $10,000. ICNU alleges that BPA has undervalued the profits it could obtain from selling power in the open market rather than to Alcoa by approximately $20 million, that forgoing such profits is not businesslike, and that BPA violated the APA by relying on an inadequate record and reasoning. PNGC claims that BPA is not operating according to sound business principles because it is not acting according to a profit-making purpose, but rather is subsidizing Alcoa (by selling it power at the IP rate, which is lower than the market rate) so as to preserve jobs at its smelting plant and the surrounding community.

**[3]** We disagree that BPA is required to maximize its profits. The Northwest Power Act mandates that BPA establish the IP rate for DSIs "at a level which [BPA] determines to be equitable in relation to the retail rates charged by the [BPA's preference] customers to their industrial consumers in the region," taking into account certain factors. 16 U.S.C. § 839e(c)(1)(B). Further, BPA must set rates "with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles," *id.* § 838g(1). But as we have previously noted, BPA's governing statutes "do not dictate that BPA always charge the lowest possible rates." *Cal. Energy Comm'n v. BPA*, 909 F.2d 1298, 1307-08 (9th Cir. 1990). Rather, we are mindful that Congress has delegated to

BPA the discretion to determine "how best to further BPA's business interests consistent with its public mission," *APAC*, 126 F.3d at 1171, and we "may only set aside such an assessment if it is unreasonable, meaning that it is 'contrary to clear congressional intent or that [it] frustrate[s] the policy Congress sought to implement,' " *PNGC II*, 596 F.3d at 1080 (alteration in original) (quoting *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002)).

**[4]** In light of the deference we are to give BPA, we cannot say that BPA's decision to enter into the Alcoa Contract was so arbitrary and capricious as to violate its statutory obligation. First, the Alcoa Contract requires BPA to sell power to Alcoa at the IP rate, not merely transfer funds as in *PNGC I* and *II*. We stated in *PNGC II* that a "physical" sale of power, with the attendant balancing of market factors, resource constraints, and business judgments it entails, would be more likely to merit our deference than would a cash payout by BPA for Alcoa to use in buying power from one of BPA's competitors. *Id.* at 1085. Second, BPA anticipated earning a profit during the Initial Period, which contrasts sharply with the hundreds of millions of dollars BPA expected to forego under the agreements in *PNGC I* and *II*, where BPA did not identify any profit from its agreement to provide funding to Alcoa. *See id.*; *PNGC I*, 580 F.3d at 823.

**[5]** Nor is there evidence supporting PNGC's claim that BPA entered into the Alcoa Contract to subsidize Alcoa. The ROD expressly disclaimed reliance on job impacts as a factor in its decision and declined to include such impacts in its Equivalent Benefits analysis. PNGC's speculation is an insufficient basis for upsetting the agency's contracting decision. *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 710-11 (9th Cir. 2009). We therefore defer to BPA's determination that a sale on the terms specified for the Initial Period is in keeping with sound business principles and find no violation of the agency's statutory mandate.

C.   BPA's Allegedly Erroneous Calculations

We next consider petitioners' claims that BPA's determination that it will net a $10,000 profit during the Initial Period is based on faulty calculations and a flawed methodology. Petitioners challenge BPA's methodology on four main grounds: (1) BPA relied on faulty data regarding weather and water flows; (2) BPA erred in calculating the value of Alcoa's power reserves; (3) BPA ignored forward market prices; and (4) BPA's calculations erroneously relied on a "demand shift," that is, the concept that by supporting Alcoa's operations, BPA increases the demand for power, which in turn raises the price of power and increased BPA's revenues from sales in the market. According to petitioners, these errors cast doubt on BPA's cost-benefit calculations and indicate that BPA will fall grievously short of the breakeven point, thereby violating the Equivalent Benefits standard.

We again approach these methodological challenges with deference to BPA's decisionmaking. In reviewing agency decisions, we are " 'not empowered to substitute [our] judgment for that of the agency.' " *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005) (quoting *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001)). "Deference to the informed discretion of the responsible federal agencies is especially appropriate, where, as here, the agency's decision involves a high level of technical expertise." *Id.*; *see also Ctr. for Biological Diversity*, 588 F.3d at 710-11.

We begin by considering the challenges to BPA's reliance on weather and water flow data. ICNU argues it was unreasonable for BPA to assume it would have a power surplus in every month of the Initial Period, given the unpredictability of weather and water levels. PNGC builds on these arguments. Although the Alcoa Contract was executed December 21, 2009, PNGC claims that later-collected water flow data

(from May 2010) show that BPA's estimates of likely power surpluses were inaccurate, thereby making it very likely that BPA will lose money during the Initial Period. PNGC also points to evidence from National Weather Service (NWS) reports that are not part of the Administrative Record, but we cannot consider new evidence on appeal that was not presented to BPA. In addition, PNGC cites NWS reports from December 17, 2009 (three days after Alcoa signed the contract and four days before BPA did so) and January 2010 that show increasingly severe water-flow conditions.

The record reveals that BPA gave adequate consideration to these matters. The agency forecast that it would be able to supply Alcoa's needs from its existing inventory (which otherwise would constitute surplus power), in all weather and flow conditions except "critical" situations. In so forecasting, it relied extensively on the 2009 Pacific Northwest Loads and Resources Study (2009 White Book) and BPA's 2010 Loads and Resources Study (WP-10 Study). Both studies supported BPA's prediction that it would have sufficient average power to serve the DSIs' needs (though BPA acknowledged the possible need to make additional "balancing" purchases based on month-to-month assessments of loads and resources). Nor did BPA erroneously ignore potential El Niño weather conditions when making its forecasts, because the model it used to generate those predictions considered dry, normal, and wet weather patterns alike.

**[6]** In sum, BPA's analysis of these issues was thorough. No factor or argument identified by the petitioners went unaddressed in the ROD, and all of BPA's explanations are plausible and rationally connected to the facts that were before it at the time. Moreover, to the extent PNGC's claims are rooted in data that did not exist at the time BPA executed the contract, such data provides no support to PNGC's argument that BPA failed to consider relevant information. *See* 16 U.S.C. § 839f(e)(2) ("The record upon review of such final actions shall be limited to the administrative record compiled in

accordance with this chapter."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." (alteration in original) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973))); *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553-54 (1978).[10] The petitioners fail to establish that BPA's dry-weather projections omitted important information or that BPA erred in not placing greater weight on those projections. Accordingly, we reject the argument that BPA was arbitrary and capricious in its consideration of how weather and water flows would affect its profits during the Initial Period.

[7] Second, PNGC argues that the terms of the Initial Period require BPA to subsidize Alcoa's rate by providing a credit for Alcoa's provision of contingency power reserves to BPA, even though BPA has a much larger, more efficient pool of power to draw on in an emergency: the Northwest Power Pool Reserves Sharing Group. Moreover, according to PNGC, Alcoa's reserves may not even comply with mandatory quality standards. BPA also addressed these issues. It analyzed benefits from Alcoa's required contribution to BPA's power reserves according to a reasonable formula, and determined that the reserves complied with industry reliability criteria. The value to BPA of the power reserves it extracts from DSI customers is the kind of issue within the particular expertise of BPA and not easily susceptible to judicial second-guessing. *See PNGC II*, 596 F.3d at 1085. We are therefore unpersuaded by this challenge to BPA's evaluation of power reserves.

---

[10]We therefore deny as moot Alcoa's motion to strike the portion of PNGC's opening brief that presented this evidence.

### D.   Waiver of Damages Provision

Next, ICNU and PPC challenge the waiver-of-damages provision in the Alcoa Agreement which provides that, in the event a court renders any part of the agreement void or unenforceable, both BPA and Alcoa waive any right to seek damages or restitution. ICNU and PPC assert that BPA is constitutionally obligated to sue for any damages to which it is entitled, pursuant to *Royal Indem. Co. v. United States*, 313 U.S. 289 (1941), and *Fansteel Metallurgical Corp. v. United States*, 172 F. Supp. 268 (Ct. Cl. 1959).[11] Petitioners are mistaken, however, as neither case involved a waiver of the right to seek damages. *Royal Indemnity* dealt with an IRS agent's decision to release a surety bond before a taxpayer had paid his obligation in full. 313 U.S. at 292-93. The Court held that Congress alone holds the "[p]ower to release or otherwise dispose of the rights and property of the United States," and that subordinate officers, such as the revenue agent at issue in the case, accordingly lacked the power to do so unless granted that power by the legislature. *Id.* at 294. In *Fansteel* (a non-precedential district court case), the court held that the government has an obligation to recoup an unlawful overpayment for goods from a vendor. 172 F. Supp. at 270.

[8] Neither case dealt with the situation present here, where an agency determined that a mutual release of future liability was in its interest. As BPA noted in its ROD, the BPA Administrator has broad powers to enter and modify contracts, including the power to compromise or settle claims.

---

[11]PPC also asserts that BPA acted arbitrarily and capriciously by not determining whether Alcoa owed a refund to BPA under the prior contracts with Alcoa which were invalidated by *PNGC I* and *II*. We previously held that BPA's failure to seek a refund from Alcoa on a prior contract was not a basis for invalidating a subsequent contract. *PNGC II*, 596 F.3d at 1081 n.11, 1086. Because the facts here are substantially identical to the facts at issue in *PNGC II*, we reach the same conclusion and reject PPC's argument here.

*See* 16 U.S.C. § 832a(f);**[12]** *see also id.* § 839f(a); *APAC*, 126 F.3d at 1170-71. Because the damage waiver provision in the Alcoa Contract falls within such claim-settling authority, it does not violate either statutory or constitutional provisions. *See Util. Reform Project v. BPA*, 869 F.2d 437, 443 (9th Cir. 1989). We likewise reject ICNU's argument that there is no basis for BPA's conclusion that such a waiver is in BPA's interest. The ROD states that the waiver will protect BPA from any damages claims that Alcoa might otherwise choose to pursue against BPA in the event of cancellation. It is not our place to second-guess the agency's considered judgment regarding the balance of risks embodied in a damage waiver or similar release or settlement provision. *See Cal. Wilderness Coal.*, 631 F.3d at 1084.

### E. Alcoa's Challenge to the Initial Period

**[9]** Having rejected the petitioners' challenges to the terms of the Initial Period, we now turn to Alcoa's challenge, namely, that it is arbitrary and capricious for BPA to refuse to sell power to DSIs at the statutorily mandated IP rate unless those sales will net at least as much profit as an open-market sale would achieve. Alcoa's position rests on flawed factual and legal premises. First, there is no support in the record for Alcoa's contention that BPA has refused to sell power unless the IP rate equals or exceeds the market rate for power. Indeed the petitioners claim that BPA could have sold the same surplus power on the open market for a higher price.

---

**[12]**Section 832a(f) provides:

> Subject only to the provisions of this chapter, the Administrator is authorized to enter into such contracts, agreements, and arrangements, including the amendment, modification, adjustment, or cancel[l]ation thereof and the compromise or final settlement of any claim arising thereunder, and to make such expenditures, upon such terms and conditions and in such manner as he may deem necessary.

**[10]** Second, BPA has no obligation to sell to Alcoa at all; if it decides to do so, it must exercise its judgment in accord with sound business principles, *see PNGC I*, 580 F.3d at 811-12. While in certain extreme circumstances we may conclude that BPA has strayed too far afield from businesslike operations, *see PNGC II*, 596 F.3d at 1073-74, in the ordinary case we will not usurp BPA's judgment regarding whether to sell surplus power to DSIs, or on what terms.

**[11]** The terms of the Initial Period here are within BPA's discretion. Because BPA did not act arbitrarily and capriciously in entering into such terms, we need not decide whether the Equivalent Benefits Test, as an abstract proposition, is wholly in accord with BPA's governing statutes. Moreover, we doubt that courts are well-suited to making such a categorical ruling; instead, we must evaluate whether BPA has violated its statutory obligation to adhere to sound business principles on a case-by-case basis. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004).

**[12]** Having considered all the petitioners' and Alcoa's specific challenges to the terms of the Initial Period, we conclude that BPA did not exceed its statutory authority, and therefore did not act arbitrarily and capriciously, by entering a contract under the terms prescribed for the Initial Period. We therefore deny the petitions for review insofar as they challenge the Initial Period of the agreement.

## III

### The Second Period of the Alcoa Contract

Petitioners also challenge the terms of the Second Period on the ground that it could involve an up to $300 million net loss to BPA that would result in higher rates for BPA's other customers, thereby violating the agency's statutory mandate to set electric power rates "at the lowest possible rates to con-

sumers consistent with sound business principles." 16 U.S.C. § 838g.

**[13]** Whether framed in terms of ripeness or standing, petitioners' alleged injury is too speculative to give rise to a case or controversy as required by Article III. A party has standing to press its claim in federal court only when it can demonstrate the existence of an injury in fact, that is, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). We have characterized the related ripeness inquiry "as standing on a timeline." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). Specifically, "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). "That is so because, if the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009). We have dismissed claims that are based solely on harms stemming from events that have not yet occurred, and may never occur, because the plaintiffs raising such claims have not "suffered an injury that is concrete and particularized enough to survive the standing/ripeness inquiry." *Id.* at 1096-97.

**[14]** Petitioners' challenge to the Second Period is too contingent and speculative to meet our standing and ripeness test. Petitioners base their claims on harms they may incur if the Second Period comes into effect, but those harms have not occurred and are not reasonably likely to occur in the future. Three hurdles stand in the way of petitioners' alleged injury. First, as originally drafted, the Second Period of the Alcoa Contract would not come into effect until this court ruled that

BPA need not adhere to the Equivalent Benefits standard. This case did not, and does not, require us to make any such determination, and we lack a basis for predicting whether there will be such a ruling in the future. Second, even if such a ruling occurred, the Second Period would not commence under the terms of the prior contract unless BPA determined it could provide service to Alcoa in a manner "consistent with any alternative standard established" by such a ruling and that the cost to serve Alcoa would not exceed specified cost caps set forth in the Alcoa Contract. These determinations would require BPA to conduct additional economic modeling of future IP rates and market prices, thereby creating a new record of decision. Finally, the parties' May 2012 amendment to the Alcoa Contract eliminated all references to the Second Period. This means that BPA and Alcoa would need to enter into a new contract that includes a similar Second Period before the petitioners could point to even the *threat* of suffering harm from the commencement of a Second Period in the future. This "chain of speculative contingencies," *Nelsen v. King Cnty.*, 895 F.2d 1248, 1252 (9th Cir. 1990), is "not sufficiently tangible or definite to meet the 'concrete and particularized' injury requirement of *Lujan*." *Bova*, 564 F.3d at 1097; *see also PNGC I*, 580 F.3d at 826 (validity of contract provision providing that BPA could elect to deliver physical power was not ripe for review because "BPA has not yet exercised its option to deliver physical power, nor has it defined the terms that would govern a physical power sale").

In claiming that petitioners have standing to challenge the Second Period, dis. op. at 12439-40, the dissent overlooks these contingencies. Its conclusion that petitioners would be injured if the Second Period commences fails to grapple with the fact that even under the original contract, such a commencement was highly speculative. Similarly, the dissent fails to account for the recent amendment eliminating the Second Period entirely. In short, the dissent provides no insight as to why the remote possibility of the Second Period is sufficiently

tangible and definite enough "to survive the standing/ripeness inquiry." *Bova*, 564 F.3d at 1097.

**[15]** Because the petitioners lack standing to challenge the Second Period, this claim cannot be salvaged under the "capable of repetition, but evading review" doctrine. That doctrine "is an exception only to the mootness doctrine; it is not transferable to the standing context" because it "governs cases in which the plaintiff possesses standing, but then loses it due to an intervening event." *Nelsen*, 895 F.2d at 1254; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (" '[T]he mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced.' ") (quoting *Renne v. Geary*, 501 U.S. 312, 320 (1991)). Where, as here, the potential future harm from the Second Period is too contingent to create an injury-in-fact, the petitioners never possessed standing, and thus they cannot invoke the "capable of repetition" exception. *Nelsen*, 895 F.2d at 1254. Therefore, the dissent is mistaken in arguing that we can consider a challenge to a harm that has not, and may never occur. Dis. op. at 12440-41.

**[16]** In sum, because the possibility that petitioners would be harmed due to BPA entering into a contract in the future that included provisions analogous to the now-deleted Second Period is too speculative to give rise to an injury in fact within the meaning of Article III, we cannot conclude that petitioners have demonstrated any injury, or threat thereof, "of sufficient immediacy and ripeness" to satisfy the jurisdictional requirements of the federal courts. *Warth v. Seldin*, 422 U.S. 490, 516 (1975). Therefore, we dismiss this claim.

IV

NEPA Obligations

**[17]** Finally, we consider petitioners' argument that BPA violated its obligations under NEPA by failing to prepare an EIS.[13] NEPA sets forth procedural requirements aimed at ensuring that an agency has "consider[ed] every significant aspect of the environmental impact of a proposed action" and has "inform[ed] the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotation marks omitted). Under certain circumstances, a federal agency must prepare an EIS, specifically, a "detailed statement" on "the environmental impact" of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1502.1. An EIS is not required if the action in question falls within a "categorical exclusion," which the applicable regulations define to mean "a category of actions which do not individually or cumulatively have a significant effect on the human environment" and "for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4; *see also* 10 C.F.R. § 1021.103 (making the Council on Environmental Quality's NEPA regulations applicable to BPA, as an agency within the Department of Energy).

---

[13]The petitioners also claim that BPA acted arbitrarily and capriciously by not explaining its change of opinion regarding the necessity of an EIS: in prior contracts, it professed a belief that an EIS was necessary and relied on one completed in 1995, whereas now it has concluded that one was not required. There was no error in this omission. BPA acknowledged that it was no longer relying on its 1995 EIS and explained its view that a categorical exclusion applied. Under the APA, nothing more was required. *See FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009).

We will uphold an agency's reliance on a categorical exclusion if "the application of the exclusions to the facts of the particular action is not arbitrary and capricious." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 & n.5 (9th Cir. 1996). In analyzing this issue, we ask "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Alaska Ctr.*, 189 F.3d at 859 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

BPA expressly invoked the relevant categorical exclusion in its ROD. Specifically, it relied on the Department of Energy regulations that exclude the following action from the requirement to prepare an EIS:

> Establishment and implementation of contracts, marketing plans, policies, allocation plans, or acquisition of excess electric power that does not involve: (1) the integration of a new generation resource, (2) physical changes in the transmission system beyond the previously developed facility area, unless the changes are themselves categorically excluded, or (3) changes in the normal operating limits of generation resources.

10 C.F.R. pt. 1021, subpart D, App. B4.1.

BPA's decision to do so was not arbitrary and capricious. As required by the regulation, BPA considered the relevant factors and determined that the present sale of power to Alcoa under the Alcoa Contract fell squarely within the terms of the categorical exclusion because it did not involve any new power-generation sources, any physical changes in transmission, or any alteration in the operating limits of existing generation resources.

In support of this conclusion, BPA explained that if its existing power supply proved insufficient to provide Alcoa

with the power mandated by the contract, the shortfall would be met through purchases on the open market (i.e., not through expansion of that capacity). Moreover, BPA noted that it would supply power to Alcoa "over existing transmission lines that connect Intalco to BPA's electrical transmission system and no physical changes to this system would occur."

[18] BPA's judgment regarding the applicability of the exclusion "implicates substantial agency expertise" and is entitled to deference. *Alaska Ctr.*, 189 F.3d at 859. Because BPA considered the relevant factors and did not make a "clear error of judgment" in determining that the categorical exclusion was applicable to its execution of the Alcoa Contract, no EIS was required, and we are obliged to reject the petitioners' contrary contentions. *See Bicycle Trails*, 82 F.3d at 1456 & n.5.[14]

V

Conclusion

[19] The petitioners' challenges to the Alcoa Contract ask us to second-guess BPA's policy judgment regarding the costs and benefits of its sale of electric power. But the belief that another approach might have been wiser is not a valid basis for jettisoning an agency action as arbitrary and capricious. We therefore deny the petitions for review insofar as they pertain to the Initial Period. Because the potential for BPA and Alcoa to enter into the Second Period of the contract is no longer before us, we dismiss those portions of the petitions. Finally, we hold that because BPA relied on a categorical exclusion to NEPA's requirements, declining to complete an

---

[14]Given our resolution of this issue, we need not address the parties' dispute regarding whether the Alcoa Contract merely maintained the environmental status quo and that an EIS was therefore unnecessary. *See Burbank Anti-Noise Group v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980) (per curiam).

EIS was not arbitrary and capricious. Accordingly, we deny petitioners' NEPA claim.[15]

**DISMISSED in part and DENIED in part.**

---

TASHIMA, Circuit Judge, concurring:

I concur fully in Judge Ikuta's majority opinion. I write separately only to note briefly that I also concur in Judge Bea's interpretation of *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186-87 (9th Cir. 2003), that the only *dicta* by which we are bound "is well-reasoned *dicta.*" Concurring and dissenting op. at 12435 n.4 (Bea, J.).

*Miranda B.* adopted the definition of *dicta* in Judge Kozinski's separate, minority opinion in *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (separate opinion of Kozinski, J.), apparently under the belief that that opinion was the expression of the majority of the en banc court. At least the opinion in *Miranda B.* does not identify the citation as anything other than the opinion of the en banc majority. The citation in *Miranda B.* following the quotation of Judge Kozinski's definition of *dicta* reads simply "*United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc)." But page 914 is part of Judge Kozinski's separate, minority opinion, which starts on page 909, and is joined in by only three other judges of the 11-judge en banc court. *See id.* at 909. Be that as it may, because it was adopted by the *Miranda B.* panel, mistakenly or otherwise, Judge Kozinski's definition of *dicta* is now the law of the circuit.

My views on what constitutes *dicta* are adequately set forth in my concurring opinion in *Johnson*, 256 F.3d at 919-21, and won't be repeated here. Suffice it for me to observe that,

---

[15]Each party shall bear its own costs on appeal.

given its subjective and amorphous nature, I concur in Judge Bea's limitation of that definition to only "well-reasoned *dicta*," as a welcome first step in cabining the expansive definition adopted by *Miranda B.*

---

BEA, Circuit Judge, concurring in part and dissenting in part:

I agree with the panel's judgment denying the petitions as to the First Period of the contract between the Bonneville Power Authority ("BPA") and the Aluminum Company of America ("Alcoa"), as extended by the parties. I dissent, however, from the panel's judgment dismissing the petitions seeking to invalidate the contract's Second Period because I find Petitioners have standing to press their claims, and that their claims are valid, as far as they are based on BPA's statutory duty to charge Alcoa the IP rate. *See* Maj. Op. Part IV. We should grant the petition as to the Second Period of BPA's contract with Alcoa.

The effect of the BPA-Alcoa contract is that BPA will lose up to $66,000,000 annually for five years ($5,500,000 a month) as the difference between BPA's costs of production and transmission and the price paid by Alcoa. These losses must be made up by rate hikes to BPA's other customers, such as Petitioners. Such losses cannot be justified by the agency's interpretations of what constitutes "sound business practices," nor by the so-called Equivalent Benefits standard, because BPA is constrained by statute to sell power to Alcoa at the IP price, and at no other price. Properly tabulated, the IP price must prevent the losses projected by BPA or, indeed, any loss at all. Micro-economic social engineering to preserve jobs at Alcoa is not within the agency's "discretion," which is just another way of saying "power."

BPA's preference customers, as well as other entities and organizations in the Pacific Northwest, filed this petition for

review, requesting that we hold the unlawful Second Period of BPA's contract with Alcoa is inconsistent with the agency's statutory mandate to act in accordance with sound business principles. They claim BPA should have maximized profits by selling power to Alcoa at market rate. Alcoa also petitions for review, arguing that BPA erred in adopting the Equivalent Benefits standard[1] because it is contrary to BPA's governing statutes, and that if BPA had not made this error, it would have entered into a contract *even more* favorable to Alcoa's interests. In short, each party contends BPA has a duty to charge its other customers more, so that it may charge the complaining party less. Each is mistaken. BPA in turn contends it should not be bound by the Equivalent Benefits standard and should have even wider latitude to determine rates. While BPA is correct that the Equivalent Benefits test, which it invented, is not binding, BPA is still bound by the Congressional statutes which govern it in determining rates—statutes it continually overlooks. Those statutes convey far less latitude in determining rates than BPA thinks.

The parties concentrate almost exclusively on the content and applicability of the Equivalent Benefits standard as a consideration in pricing. They ignore the plain language of the relevant statutes which mandate that BPA is authorized to sell power to Direct Service Industrial ("DSI") customers such as Alcoa at the Industrial Firm Power rate (the "IP rate")—not more as Petitioners contend, and not less as BPA and Alcoa contend. *See* 16 U.S.C. §§ 838g, 839a(10), 839c(b),

---

[1]The Equivalent Benefits standard is an amorphous, undefined standard invented by BPA that does not appear in the statute, and that has not been clearly defined by BPA or our court. As best I can understand it, it allows the agency to incur losses by pricing power sales below its costs, so long as the agency finds that preserving employment at Alcoa will bestow benefit upon its other clients, in the greater scheme of things, equivalent to the higher rates they must pay to make up the loss caused by the below cost pricing. As explained in this dissent, this understanding of the Equivalent Benefits standard is flatly contradicted by higher authority: Congress' statutes. *See* pp. 12425-30 *infra*.

839e(b)(1). Because the Second Period of BPA's contract with Alcoa fails even to recover BPA's costs, let alone charge Alcoa the IP rate, it violates BPA's governing statutes.

The majority thinks it best not to address the parties' attempt to draft a Second Period of the contract now. It would rather wait until the parties draft a new contract and then review those terms. It concentrates entirely on the recent letters by the parties making it clear they will not draft a new contract until after a ruling from this court. Maj. Op. at 12414-15. The majority's view has a definite appeal to it, and if this were an ordinary contract affecting only the contracting parties, I might agree. But this is *not* an ordinary contract. To the contrary, the terms of the new contract will affect the rates BPA charges millions of other customers. And the majority's opinion does not give the parties the guidance they have shown they need. Most importantly, the history of contracts between BPA and Alcoa shows that these parties have repeatedly entered into contracts designed to subsidize Alcoa, and will continue to do so in the future. In these letters relied on by the majority, neither BPA nor Alcoa agree to set out their options for the terms of the contract they might draft in the future—including any provisions for payment of damages caused to the Petitioners should the contract be found to be invalid under the governing statutes. It is foolish for us to ignore what these parties have actually done in the past. We should give these filings little weight given the consistent conduct of the parties in the past, and the heavy price paid by the public each time. I fear it is the majority that is ignoring the relevant evidence in the record of the parties' past conduct.

This is the third time we have reviewed a contract between BPA and Alcoa in which BPA essentially subsidizes Alcoa's purchase of power in the amount of roughly $60,000,000 a year. It is predictable that BPA and Alcoa will enter into yet another contract which will result in Alcoa purchasing power at less than the IP price, and it is predictable that yet again the

wheels of the judicial review system will grind too slowly to avoid the resultant and unrecoverable rate hikes to preference customers which BPA must put in place to balance its books. Thus, like our review of the First Period, this is a problem capable of repetition, yet escaping judicial review. We should hold that this new form of subsidy is equally invalid.

Because BPA continues to sell power to Alcoa and will in all probability continue to do so in the future, and because the terms of the Second Period could result in a loss of up to $5,500,000 per month, it is prudent to set forth a few principles the parties must keep in mind when re-negotiating their contract.

First, BPA is prohibited by statute from selling power to any of its customers below its properly tabulated costs of production and transmission. The PF rate for preference customers must cover that cost. The IP rate for direct service industrial customers must similarly cover the costs of production and transmission, plus the normal retail markup the industry-owned utilities in turn charge their customers. BPA can sell power to Alcoa only at the IP rate.

Second, the parties misinterpret the phrase "sound business principles" in the statute. This phrase usually applies to proper cost accounting principles for long-term assets; it does not justify BPA subsidizing Alcoa by charging it a rate lower than the IP rate, let alone a rate lower than BPA's costs. It calls for BPA to use sound judgment in the allocation of costs; it does not give BPA permission to engage in regional economic planning.

Third, the present BPA-Alcoa contract ignores this statutory mandate and anticipates that BPA will lose up to $330,000,000 in its performance of the contract during the Second Period. The BPA-Alcoa contract provides that BPA will recover this loss by raising the rates it charges its other customers by up to four percent (4%); thus Petitioners will be

directly affected financially by the contract if BPA and Alcoa continue as stated in their contract. And the contract provides that Petitioners cannot simply sue afterwards to recover this money.

Fourth, if Petitioners are forced to wait until the Second Period has begun to challenge the BPA-Alcoa contract, it will be in large measure too late to prevent their quite foreseeable overcharges. BPA will lose approximately $5,500,000 a month until a final judicial ruling. BPA must make up that loss by raising rates on its other customers, including Petitioners, because it is prohibited by statute from seeking funds from the federal government to make up its loss and there is no other purse to tap. And, according to the contract, if the BPA-Alcoa contract is found to be invalid, BPA cannot seek damages from Alcoa. Once the operating losses are sustained, BPA will have no other avenue than to raise the rates its charges its other customers to make up the loss.

Thus, I dissent from the court's judgment as to the Second Period because the terms of the Second Period of the BPA-Alcoa contract violate BPA's statutory duty to recover its costs *before* BPA loses millions of dollars recoverable only by imposing a surcharge on its other customers such as Petitioners; and I dissent from that portion of the court's judgment that Petitioners do not have standing to have this determination made.

# I

## BPA is prohibited by statute from selling power to Alcoa at a loss.

When reviewing a challenge to an agency's statutory authority, we must "begin . . . by examining the statutory language." *Pac. Nw. Generating Coop. v. Dep't of Energy* ("*PNGC I*"), 580 F.3d 792, 806 (9th Cir. 2009). If Congress clearly expressed its intent, we "reject administrative con-

structions of a statute that are inconsistent with the statutory mandate or that frustrate the policy Congress sought to implement." *Id.* (citations omitted).

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (footnotes omitted). Here, Congress directly spoke to the issue of what rates BPA must charge DSIs—the IP rate. Let us review the overall rate structure created by Congress.

BPA's statutory framework sets out the specific criteria by which BPA determines the rates it may charge for power to each of the three different categories of customers it serves.

First, BPA must sell power to its "preference" customers and the investor-owned utilities ("IOUs"), 16 U.S.C. § 839c(b), at a cost-based rate referred to as the Preference Customer's rate or "PF rate." 16 U.S.C. § 839c(a); 16 U.S.C. § 839e. Those rates "*shall* recover the costs of that portion of the Federal base system resources needed to supply [preference and IOU customers'] loads until such sales exceed the

Federal base system resources." 16 U.S.C. § 839a(10) (emphasis added).[2] The power generated by BPA itself goes into the Federal base system. The recovery of BPA's costs is not discretionary. Rates must, at a minimum, recover BPA's costs. The Northwest Power Act:

> directs BPA to "establish, and periodically review and revise, rates for the sale and disposition of electric energy," § 839e(a)(1), which are subject to "confirmation and approval" by the Federal Energy Regulatory Commission [("FERC")] upon a finding by the Commission that, among other things, "such rates . . . are based upon [BPA]'s total system costs." § 839e(a)(2)(B). Rates for preference customers are *mandated*, accordingly, to be sufficient to "recover the costs of that portion of the Federal base system resources needed to supply such loads," § 839e(b)(1), with "Federal base system resources" . . . .

*PNGC I*, 580 F.3d at 801 (italics added). Thereafter, such rate or rates *"shall* recover the cost of additional electric power as needed to supply such loads . . . ." § 839e(b)(1) (emphasis added). In a nutshell, if the Federal base system resources do not supply sufficient power, and BPA must buy the power in the market, BPA must charge the market rate to its customer.

Second, BPA must charge its DSI customers the IP rate which is prescribed by 16 U.S.C. § 839e(c). The IP rate must

---

[2]16 U.S.C. § 839a(10) defines "Federal base system resources" as:

(A) the Federal Columbia River Power System hydroelectric projects;

(B) resources acquired by the Administrator under long-term contracts in force on December 5, 1980; and

(C) resources acquired by the Administrator in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph.

be "equitable in relation to the retail rates" charged by BPA's preference customers to their own industrial consumers in the region, so long as the price charged by the preference customers is "based upon the Administrator's applicable wholesale rates to [preference and IOU] customers and the typical margins included by such [preference and IOU] customers in their retail industrial rates." 16 U.S.C. § 839e(c)(1)(B), (c)(2). Note that this provision does not provide an exception to allow BPA to lower prices below the IP rate, even if to do so would accord with sound business principles.

Title 16, Section 838g also prescribes general factors BPA must balance when setting rates for the sale and transmission of federal power:

> Such rate schedules . . . shall be fixed and established (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles, (2) having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric power . . . .

Section 839e similarly states that BPA's rates:

> shall . . . recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment in the Federal Columbia River Power System . . . and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law.

16 U.S.C. § 839e(a)(1). Thus, when setting rates for any of its customers—whether preference, IOU or DSI—BPA must

charge a rate that, at a minimum, recoups BPA's own costs of generating or acquiring the electricity. Accordingly, the phrase "sound business principles" would apply to issues such as how to factor depreciation. As explained by our previous decision in *PNGC I*, however, the phrase does not mean BPA can decide that lowering rates for one category of customers justifies raising rates for another category. *PNGC I*, 580 F.3d at 821-22.

BPA argues that as a supplier of energy, it is a sound business principle for it to subsidize such large customers as Alcoa, at least for a period of time, rather than see such a customer close its doors with the resulting effect that would have on the local economy. We have previously rejected such arguments:

> By subsidizing the DSIs' smelter operations beyond what it is obligated to do, BPA is simply giving away money. . . . The agency cites its "historic relationship with the DSIs, the important role the DSIs played in the development of the [federal power systems], and the importance to local economies of DSI jobs" as reasons for the payments. These justifications for simply giving a few of its customers nearly $300 million, however laudable, are simply not reflective of a "business-oriented philosophy," nor do they "further [BPA's] business interests." *Id*.

> As we made clear recently in another context, BPA's governing statutes restrain BPA's activities even when, on a pure policy basis, those policies have much to recommend them.

*PNGC I*, 580 F.3d at 822-23. This is one such instance. BPA is directed to operate with "sound business principles" but the minimum its must charge the DSIs is the IP rate. 16 U.S.C. § 839e(c)(1)(B), (c)(2).

If BPA were to sell electricity to Alcoa at the statutorily-mandated IP rate, it would not lose any money, let alone $330,000,000. Remember, the IP rate is the PF rate (which recovers costs) plus the profit margin IOUs are charging their own customers. It means that DSIs have no advantage over the other businesses that buy their electricity from the IOUs instead of directly from BPA.

## II

**The phrase "sound business principles" in the statutes does not justify BPA charging DSIs a rate that fails to recover BPA's costs.**

By entering into this Second Period of the contract, BPA evinces a renewed misunderstanding of the impact of our opinions interpreting the phrase "sound business principles" as that phrase is used in BPA's governing statutes.

The phrase "sound business principles" appears in a number of different statutes governing BPA's actions. Where the phrase is used in connection with setting rates, it appears to be a limitation on BPA's ability to charge low rates, not a factor that would justify charging rates that do not recover BPA's costs and are thus even below the PF rate.

There are four relevant statutory references to the "sound business principles" in relation to the operation of BPA. 16 U.S.C. § 825s provides that "the Secretary of Energy . . . shall transmit and dispose of [Army-supervised reservoir projects'] power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers *consistent with sound business principles*" (emphasis added). Notice that BPA is not instructed to charge is customers "the lowest possible rates." Rather, it is instructed to charge "the lowest possible rates consistent with sound business principles."

Section 838g prescribes the factors BPA must balance when setting rates for the sale and transmission of federal power:

> Such rate schedules . . . shall be fixed and established (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers *consistent with sound business principles*, (2) *having regard to the recovery* (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) *of the cost of producing and transmitting such electric power* . . . and (3) at levels to produce such additional revenues as may be required, in the aggregate with all other revenues of the Administrator, to pay [all expenses associated with] bonds issued and outstanding pursuant to this chapter, and amounts required to establish and maintain reserve and other funds and accounts established in connection therewith.

(emphasis added). Note that although operating with "sound business principles" is listed here in the rate making section, BPA must have "regard" for the recovery its costs of production, transmission, and debt service are listed as an independent requirements.

The phrase "sound business principles" is also used in connection with BPA's calculation of the recovery of costs. Section 839e sets guidelines for fixing "rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power [in other words, power that is not from the Federal Base System]." Specifically, those rates:

> shall . . . recover, *in accordance with sound business principles*, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment

in the Federal Columbia River Power System . . . and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law.

§ 839e(a)(1) (emphasis added).

Finally, the BPA Administrator is charged with "assur[ing] the timely implementation of [16 U.S.C. §§ 839-839h] in a *sound and businesslike manner*." § 839f(b) (emphasis added).

A handful of the court's prior cases have given some meaning to the phrase "sound business principles," although no panel has given the phrase a comprehensive definition. Most relevant are *PNGC I* and *Pac. Nw. Generating Coop. v. BPA*, 580 F.3d 828 (9th Cir. 2009), *amended on denial of rehr'g by* 596 F.3d 1065 (9th Cir. 2010) ("*PNGC II*"). *In PNGC I*, BPA executed a contract with the aluminum DSIs such as Alcoa and the local utilities. As with all these contracts, the terms were complicated but, in essence, BPA agreed to pay each of the aluminum DSIs a monetary payment equal to the amount of physical power the DSI purchased from the local utility partner multiplied by the difference between BPA's PF rate and the market rate. *See* 580 F.3d at 798-800. This agreement was to last five years, but BPA retained the right simply to supply the DSIs with power directly at the PF rate during the last two years. *Id.* Thus, the DSIs could buy as much or as little power as they wanted from any electricity supplier at the PF rate, instead of having to pay the higher IP rate or market rate. BPA acknowledged that "service to the DSIs will come at the expense of higher rates paid by . . . preference customers." *Id.* at 801.[3]

---

[3]Importantly, in *PNGC I*, "[n]o party challenges BPA's statutory authority to sell power at mutually agreed upon rates that have not been previously approved by FERC. This Court therefore assumes, without deciding, that BPA has such authority." 580 F.3d at 803 n.13.

This court held that monetary payments by BPA to Alcoa and other DSIs was "highly suspect" because, *inter alia*, BPA was giving Alcoa such a large subsidy that Alcoa could acquire power at an effective rate that was below both the market-price and the statutorily prescribed IP rate. BPA contended, as it does here, that it could sell power to DSIs at a rate below the IP rate. We clearly held:

> BPA's interpretation of [its ability to sell power to DSIs at a rate other than the IP rate] is unreasonable on two grounds. First, it ignores the plain language of the statute and, in so doing, renders the IP rate superfluous. Second, it runs counter to the NWPA's legislative history, which evinces Congress's intent that BPA offer power to the DSIs, if at all, at the IP rate, not at some other rate of its choosing.

580 F.3d at 812-13. We also considered and rejected the argument that DSIs might be entitled to purchase power at the lower PF rate:

> Having concluded that BPA must first offer DSIs the IP rate—and in light of Alcoa's failure to identify which cost-based rate it thinks it deserves—we next consider whether the DSIs are also entitled to an offer at the PF rate. We hold that they are not. . . . [T]he plain language of § 839e(b) & (c) permits only one conclusion: that the DSIs are not entitled to the PF rate.

*Id*. at 818.

Because the size of the monetary payment to the aluminum DSIs would have resulted in higher rates for all other BPA customers, the court viewed it as inconsistent with BPA's mandate to provide power at "the lowest possible rates to customers *consistent with sound business principles*." *Id.* at 820-21 (quoting § 838g). Specifically, we held that " [i]n

essence, BPA has voluntarily agreed to forgo revenues by charging the DSIs a rate below what is authorized by statute (*i.e.*, the IP rate) and below what is available on the open market. These foregone revenues result in higher rates for all other customers. This outcome is in apparent and direct conflict with BPA's statutory mandate, *see* § 838g, and renders BPA's decision to 'monetize' the DSI contracts in an amount reflective of those underlying rate decisions—albeit a capped amount—highly suspect." *Id*. at 820-21. Thus, we considered BPA's argument that it was acting in accordance with "sound business principles" and specifically rejected the argument that such actions could trump BPA's duty to charge the IP rate. We specifically held BPA had a duty to sell to Alcoa at the IP rate, rather than subsidizing it at a lower rate because this would require BPA to raise the rates it charged its other customers. *Id*. at 822-23 (rejecting BPA's rationale that it was in BPA's business interests to offer this lower rate to the DSIs).

Instead of following the clear holding of *PNGC I*, BPA again tried to subsidize Alcoa. The economics of producing that subsidy led to another challenge. In *PNGC II*, BPA executed an amended contract with Alcoa that provided BPA would simply pay Alcoa up to $32,000,000 annually. 596 F.3d at 1080. That contract, too, would have resulted in higher rates for BPA's other customers. *Id.* at 1080-81. We again concluded that many of the arguments BPA advanced as justifications for its contract with Alcoa could not support the conclusion that the contract was an exercise of sound business principles. *Id.* at 1082. There was no evidence in the record supporting BPA's conclusion that Alcoa was likely to provide enough of a future benefit to BPA to make up for BPA's annual transfer of $32,000,000 to Alcoa; in fact, the evidence was to the contrary. Alcoa was in decline and did not show a strong likelihood of recovery. *Id.* at 1083-84.

*PNGC II* expressly noted that a sale of physical power was a different situation from the monetary payment at issue, and was one that *might* require this court to defer to BPA:

> [A]lthough we do not defer to BPA's determination that paying Alcoa $32 million was "consistent with sound business principles," the agency's conclusion that a physical sale of power to Alcoa, *even at loss*, furthered its business interests might very well warrant our deference.

*Id.* at 1085 (italics added). This *dicta* is what BPA believes frees it from recovering its costs, as required by the statute.

BPA interpreted the word "loss" in the hypothetical in *PNGC II* to mean that even if it sold power to Alcoa at a rate that failed to recover its costs, that decision might be justified.[4] BPA took this statement out of context. The panel was responding to the petitioner's argument that BPA was required to sell power to Alcoa at the market rate—thus making a larger profit off of Alcoa, which could then be used to lower the PF rate BPA charged petitioners. Petitioners referred to any rate below market rate as a "loss" because in their view BPA could be making more money if it charged Alcoa market rate, rather than the IP rate. Thus, the panel used the word "loss" in the sense of opportunity cost. In other words, it used the phrase to represent the difference between the market rate and the IP rate, not the difference between the rate BPA charges its customers and the costs of production. Hence, the panel was *not* writing on a case involving a loss

---

[4]Even if the panel did overlook BPA's statutory duty to sell to DSIs at the IP rate, we are not bound by this *dicta*, which was based purely on a hypothetical situation. We are bound only by *dicta* that is well-reasoned *dicta*. "[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc); *see also Miranda B v. Kitzhaber*, 328 F.3d 1181, 1186-87 (9th Cir. 2003). The issue of sales below costs was not confronted in *PNGC II*. A hypothetical that is unnecessary in any sense to the resolution of the case, and is determined only tentatively (note the court's use of the word "might") does not make precedential law. Accordingly, it is not binding.

resulting from BPA charging a price below the IP rate. The rate would still have to be the IP rate as clearly held in *PNGC I*. 580 F3d at 812-13.

As shown above, BPA's reading of the phrase "even at a loss" in *PNGC II* is taken out of context. We were still bound by those statutes in our ruling. Because the IP rate can never be below BPA's cost, BPA is not authorized to sell power at a rate that would fail to recover its costs. Yet that is exactly what the Second Period of BPA's contract with Alcoa does.

### III

### The Second Period of BPA's contract with Alcoa will lose money, which the contract states BPA will recover by raising Petitioner's rates.

Rather than recovering BPA's costs and the same profit margin the IOUs make in reselling power (the IP rate), the Second Period of the contract between BPA and Alcoa actually plans for BPA to incur a net loss. The contract initially sets the cost cap—*i.e.*, the amount of loss BPA is willing to incur—at $300,000,000 over a five year period, but BPA can decide to increase this cost cap to $330,000,000.[5]

The Second Period of Alcoa's contract with BPA violates the statutory mandate that BPA must recover all its costs. The paragraph titled "Cost Caps" states:

> If service were to be provided to Alcoa for a Second Period, which requires the court to modify the

---

[5]Of course, any contract that was expected to result in an actual loss at all, let alone a $330,000,000 loss, would violate BPA's duty to charge DSIs the IP rate. §§ 838g, 839a(10), 839c(b), 839e(b)(1). As noted above, the IP rate is based on the PF rate plus the typical margin of profit charged by IOUs to their own industrial customers. § 839e(c)(1)(B), (2). The PF rate itself requires that BPA "shall recover" its costs. *See* §§ 839a(10), 839e(b)(1).

Equivalent Benefits test, at a forecasted cost match-ing the maximum allowable under the Cost Caps, and if it were to be served at a weighted average annual IP rate linked to BPA's Tier 1 PF rate fore-casted to be $38.22 per Mwh, *a cost of only $60 mil-lion per year, or $300 million for the entire Second Period, would be borne by the preference customers.* (*See* Table 2 of Exhibit B in the Block Contract) Using the traditional yardstick that $60 million in cost per year translates into a one mill per kWh impact in the PF rate, the PF rate would increase by approximately one mill per kWh. That is a modest and tolerable rate increase, and one that BPA believes is reasonable given the tangible and intangi-ble benefits of continued DSI service, as discussed in this ROD. *We project that even with such an increase, the Tier 1 PF rate will be no more than 4% greater* (and lower under an expected case) that they otherwise would be as a result of service to DSIs (all other things being equal), a level that continues to assure preference customers very substantial system benefits. The PF rate would still be substantially below expected market rates.

(Emphasis added). In other words, BPA has decided it will compel its preference and IOU customers to subsidize Alcoa in the amount of $330,000,000 over five years. BPA does not have the authority to do this.

During oral argument, counsel conceded that the second period of Alcoa's contract with BPA *would in fact* result in a loss of $300,000,000. Counsel stated that BPA would not be able to generate the power Alcoa would need, and thus BPA would have to purchase the power on the open market. This creates the risk that the price on the open market will be greater than the BPA-Alcoa contract price. Counsel also con-ceded that the $300,000,000 to $330,000,000 was not just a cost cap, but would in fact be the actual loss BPA would sus-

tain. As the contract states, this loss will result in a rate hike to BPA's other customers up to 4%. Thus, the Second Period of BPA's contract with Alcoa, which will result in BPA losing money (and having to raise the rates it charges its preferred customers and IOUs 4%), does not comply with the statutory mandate of § 839e(c)(1)(B), (2) that BPA charge Alcoa the IP rate.

Because the second Period of BPA's contract with Alcoa anticipates that BPA will not recover its costs, and instead will lose $330,000,000, BPA is acting "in excess of [its] statutory authority" and we cannot defer to it. *PNGC I*, 580 F.3d at 806. Clearly BPA is not charging Alcoa the IP rate because, if it were, it would not be losing money by the performance of the contract.

Nor can Petitioners simply sue later to recover their damages if BPA continues this pattern of conduct. The Northwest Power Act states, in part, "For purposes of sections 701 through 706 of Title 5 [i.e., the Administrative Procedure Act ("APA")], the following actions shall be final agency actions subject to judicial review . . . 839f(e)(1)(G) final rate determinations under section 839e of this title . . . ." 16 U.S.C. § 839f(e)(1). Accordingly, rate making is reviewed pursuant to the APA. Under the APA, "monetary damages" are not available. 5 U.S.C. § 702. BPA's rates are the basis of this suit.

If Petitioners were suing BPA for a breach of contract, then they could sue for the total amount of their damages. 16 U.S.C. § 832a(f).[6] Here, however, BPA has not breached a

---

[6]16 U.S.C. § 832a(f) provides as follows: "Subject only to the provisions of this chapter, the Administrator is authorized to enter into such contracts, agreements, and arrangements, including the amendment, modification, adjustment, or cancelation thereof and the compromise or final settlement of any claim arising thereunder, and to make such expenditures, upon such terms and conditions and in such manner as he may deem necessary."

contract with Petitioners. Rather, Petitioners have sued because BPA's contract with Alcoa requires BPA to raise its rates with other third parties. Petitioner's claim seeks a change in BPA's rate making, and is thus under the APA. At most, it could be said that Petitioners are suing BPA for the negligent discharge of its duties. But then their recovery would be limited to a total of $1,000, 16 U.S.C. § 832k(a), not the $330,000,000 they have been overcharged.

## IV

### Petitioners have standing to challenge BPA's contract.

Once BPA begins losing money under the Second Period of the contract, it will have no choice but to raise the rates of its other customers to make up for this loss. This is because BPA can neither go to Congress for the money nor seek damages from Alcoa.

In 1974, Congress stopped funding BPA's operations and required BPA to finance its own operations from the rates that it charges for the sale and transmission of electric power. 16 U.S.C. § 838i; *Aluminum Co. of Am. v. Bonneville Power Admin*., 903 F.2d 585, 588 (9th Cir. 1990). Thus, any loss BPA incurs from selling power to Alcoa must be recovered through an increase in rates. BPA cannot simply ask Congress for more money as so many other federal agencies do each year.

Further, BPA's contract with Alcoa specifically states that BPA cannot seek damages from Alcoa in the event this court holds that part of the contract exceeds BPA's statutory authority.[7] Therefore, it is Petitioners who will be harmed if the Sec-

---

[7]Provision 21.11 of the contract, Waiver of Damages, provides:

In the event the Ninth Circuit Court of Appeals or other court of competent jurisdiction issues a final order that declares or ren-

ond Period of the contract between BPA and Alcoa takes effect.

To have standing, Petitioners must demonstrate the existence of an injury in fact, that is, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).

Petitioners meet this standard. *See PNGC II*, 580 F.3d at 804 (holding that BPA's preferred customers and IOUs had standing to challenge BPA's contract with Alcoa because it would result in higher rates for the petitioners); *Cal. Energy Comm'n v. Bonneville Power Admin.*, 909 F.2d 1298, 1306 (9th Cir. 1990) (holding that one group of customers has standing to challenge a BPA contract when they demonstrated "1) that the challenged action caused them injury in fact, 2) that the injury was within the zone of interests to be protected by the statutes that were allegedly violated, and 3) that the relief sought would cure the injury."); *Alum. Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989) (holding that a party has standing to challenge actions by BPA that result in that party paying higher rates than it would if BPA had complied with its governing statutes).

The problem with waiting until BPA and Alcoa enter into the Second Period to address the merits of the contract is that

---

ders this Agreement, or any part thereof, void or otherwise unenforceable, neither Party shall be entitled to any damages or restitution of any nature, in law or equity, from the other Party, and each Party hereby expressly waives any right to seek such damages or restitution. For the avoidance of doubt, the Parties agree this provision shall survive the termination of this Agreement, including any termination effected through any order described herein.

BPA and Alcoa have also had similar provisions in their previous contract. *See PNGC II*, 596 F.3d 1065.

appeals can take quite a long time, especially complicated ones involving multiple parties, such as suits over BPA contracts. Although it is possible for Petitioners to obtain judicial review before the entire five year period would expire, the harm in this case would be ongoing, not something that occurs only upon completion of the entire five year period. Because BPA would be losing approximately $5,500,000 each month according to its own calculations, the harm Petitioners now seek to prevent through their current challenge would occur "before either this court or the Supreme Court can give the case full consideration." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 855 (9th Cir. 1999) (internal quotation marks omitted). Thus, it makes more sense for Petitioners to challenge the action before it goes into effect and seek a permanent injunction. And, as stated above, Petitioners cannot sue later to recover their damages. Once the damage is done, all they can do is seek a change in the rates BPA sets.

Because BPA has stated in its contract that it will raise Petitioner's rates if the Second Period of its contract with Alcoa goes into effect, and because BPA cannot recover its losses any other way, Petitioners have demonstrated that if they are required to wait until the Second Period of BPA's contract with Alcoa has begun to bring a challenge, they will suffer an "irreparable injury that is not correctable on review of final BPA action." *Public Util. Comm'r of Oregon v. Bonneville Power Admin.*, 767 F.2d 622, 630 (9th Cir. 1985); *Cal. Energy Comm'n v. Johnson*, 767 F.2d 631, 634 (9th Cir. 1985). Not only will an injunction or declaratory judgment remedy Petitioner's injury, but it is the *only* thing that will remedy the injury, because the damages cannot be remedied after they occur.

## V.

### The parties continue to repeat their legal errors.

Nor is the case rendered moot by the parties' statements that they will not enter into the Second Period unless this

court issues an opinion that BPA is not bound by the Equivalent Benefits standard. The same rationale that applies to our review of the Initial Period of the contract—that it is an action capable of repetition yet escaping judicial review—applies to the Second Period as well. *See* discussion at Section III A of the majority opinion. In fact, Petitioners' challenge to the Second Period of the contract makes far more sense than does their challenge to the Initial Period. By obtaining an injunction or a declaratory judgment, Petitioners can stop the loss before it happens, whereas if we wait to review the contract after it has taken place, all our decision could achieve is to prevent BPA from making the same mistakes again. It would not remedy or prevent the harm from occurring in the first place, which is what is needed. *Feldman v. Bomar*, 518 F.3d 637, 642-43 (9th Cir. 2008); *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1978).

Although BPA has indicated in its letter to this court dated May 31, 2012 that it has extended the Initial Period of its contract with Alcoa instead of beginning the Second Period, BPA has a history of entering into contracts in which it attempts to subsidize Alcoa's operations with terms similar to the Second Period.

This is the third time in a row that BPA has entered into a contract with Alcoa that is not based on the IP rate, and it is the third time in a row that all the parties have failed to read the plain language of the statutes. *PNGC II*, 580 F.3d 828; *PNGC I*, 580 F.3d 792.

\* \* \*

For the foregoing reasons, we should grant the petition and hold that the Second Period of BPA's contract violates BPA's statutory duty to charge DSIs the IP rate under 16 U.S.C. §§ 838g, 839a(10), 839c(b), 839e(b)(1).